UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(West Palm Beach Division)

CASE NO.: 9:25-cv-81573-DMM

NEAL MAGENHEIM and ANGELA NEIL,
*on behalf of themselves and all others*
*similarly situated*,

       Plaintiffs,

vs.

NIKE, INC., *an Oregon corporation*,

       Defendant.

_____/

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, NEAL MAGENHEIM and ANGELA NEIL ("Plaintiffs"), bring this class action lawsuit against Defendant, NIKE, INC. ("Defendant"), on behalf of themselves, and all others similarly situated, and allege:

### NATURE OF THE ACTION

1. This case involves a pressing problem. Large corporations, data brokers, and marketers, are incessantly installing tracking software on private computers, without notice or consent, which is used to surveil, track, target, and pester people online, on social media, and on streaming television ads.

2. This pervasive online surveillance is notwithstanding that most Americans expect to remain *anonymous* online unless they intentionally provide identifying information. A recent study found that eighty six percent (86%) of Americans expect to be anonymous online and

actively take steps to avoid being identified and spied upon.[1] Ninety percent (90%) of Americans believe they should have a say in whether their information is shared online.[2]

3.      Nevertheless, using its website, this Defendant causes invasive computer software to be surreptitiously installed on unsuspecting web browsers, which then captures personal data, tracks and surveils, and shares it with third parties for commercial benefit.

4.      Specifically, as soon as a visitor lands on Defendant's website, www.nike.com (the "Website"), Defendant triggers the installation of third-party tracking software on that visitor's web browser without permission. Defendant does not seek consent *prior to* installing tracking software on each visitor's web browser (as many others do, as by using "cookie consent banners"). This is true even where a visitor has enabled its web browser's Global Privacy Control indicator ("GPC Flag"), which notifies Defendant that the visitor does not agree to installation of invasive third-party tracking code on its web browser.[3]

5.      Defendant makes a further mockery of legal compliance by including a small link at the bottom of its Website entitled "your privacy choices," which, when selected, allows users to feel that they are withholding consent for Defendant to share visitor data with third parties. But incredibly, even when a user somehow makes it to that obscure page, and specifically withholds permission for Defendant to share data with others (by which time Defendant has already violated the law by triggering the installation of invasive code unlawfully), Defendant *still deploys* the software onto the visitor's computer – which the visitor overtly instructed Defendant not to do.

---

[1] https://www.pewresearch.org/internet/2013/09/05/part-1-the-quest-for-anonymity-online.

[2] https://www.odwyerpr.com/story/public/11834/2019-01-04/online-privacy-becomes-top-concern-2019.html

[3] A Global Privacy Control (GPC) flag is a setting in a web browser that automatically sends a universal signal to websites, telling them that the owner of the web browser is opting out of the sale or sharing of its personal information. This single, global signal is designed to simplify the process of exercising privacy rights by automatically declining the installation of code on the web browser from the moment the visitor lands on the webpage.

6.      To be clear, this case is not about Defendant recording the IP address of its own Website visitors or deploying resources necessary to render its Website; but rather, it is about Defendant's installation of third-party code on each visitor's computer, which then tracks, surveils, and reports the movements and communications of that visitor back to those third parties, long after the visitor leaves Defendant's website, and sometimes forever.

7.      As set forth below, Defendant's installation of third-party tracking and surveillance software onto its visitors' private computer systems, without notice or consent, for Defendant's commercial advantage, constitutes a violation of law, entitling Plaintiffs, and a class of similarly situated persons, to appropriate relief.

## **PARTIES**

8.      At all times material hereto, Plaintiff, Angela Neil, was and is a citizen and resident of Palm Beach County, Florida.

9.      On September 28, 2025, Ms. Neil visited the Website from her personal computer, which is a private and personal device belonging to Ms. Neil alone.

10.      At all times material hereto, Plaintiff, Neal Magenheim, was and is a citizen and resident of St. Lucie County, Florida.

11.      On November 13, 2025, Mr. Magenheim visited the Website from his personal computer, which is a private and personal device belonging to Mr. Magenheim alone.

12.      Plaintiffs bring this action on behalf of themselves, and on behalf of all other similarly situated individuals.

13.      At all times material hereto, Defendant, Nike, Inc., was and is an Oregon corporation, which is registered to do business, and doing business, in Palm Beach County, Florida.

3

14.     Nike owns and/or operates the Website for commercial purposes, and on information and belief, has control over the contents of the Website, has control over the presence of third-party tracking and surveillance technologies on the Website (as described further below), profits by allowing the Website to be used as a platform for deployment of third-party tracking and surveillance technologies, and pays third parties to deploy and use third-party tracking and surveillance technologies on the Website (which are then used to track Website visitors around the internet for long periods of time, and sometimes forever).  Plaintiffs have been victims of this scheme.

## **JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative class members.

16.     The Court has personal jurisdiction over Defendant in this action pursuant to 18 U.S.C. §1965, the Due Process Clause of the U.S. Constitution, and the Florida long-arm statute, §48.193, Florida Statutes, because Defendant's Website is usable and viewable by consumers located inside Florida, who order and pay for products through the Website from within Florida, and who make financial payments to Defendant for its products from within Florida, which products are then delivered by Defendant to consumers inside Florida. Defendant has made and is making sales through the Website to customers located in Florida and/or has shipped products purchased through its Website to its Florida customers.

17.     Furthermore, Defendant used the Website to install certain software (as explained in full below) on web browsers inside Florida, without consent, thus subjecting Florida citizens to unlawful intrusions, privacy violations, and surveillance, within Florida.

4

18. Finally, Defendant is registered with the Florida Secretary of State to do business in Florida, and maintains a registered agent in Florida, whose address is 801 US Highway 1, in North Palm Beach, Florida, which is located within this District.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant has a registered agent in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTS

20. When a user visits any website, code from the landing web page instructs the browser to download resources required to render and interact with the webpage. This is normal and common practice. These resources include images, HTML, JavaScript, Cascading Style Sheets (CSS), and other file types. When a resource is downloaded from a remote server, the browser transmits identifying information as part of the request via HTTP headers or the request URL (Uniform Resource Locator). This information includes:

   a. **Necessary Cookies**: Small text name/value pairs stored on the device tied to a specific domain, subdomain, or folder of a website. They can uniquely identify users across sessions and domains, and multiple necessary cookies may be set during a single visit.

   b. **User-Agent**: A string allowing servers and network peers to identify the application, operating system, vendor, and/or version of the requesting user agent.

   c. **IP Address**: The publicly routable IP/port from which the TCP (HTTP/1.1, HTTP/2) or QUIC (HTTP/3) connection originates.

d.   **HTTP Protocol Version**: The version number, such as HTTP/1.1, HTTP/2, or HTTP/3 indicates which specific set of rules and features is being used for a request and determines how data is processed.

e.   **Data Payload**: Any data specifically passed as part of the request.

f.   **Origin URL**: The URL from which the resource is being requested.

21.   When visiting www.nike.com, the code loaded from the Website instructs the visiting web browser to download resources required to render the page. Many of these resources are standard and innocuous (or even required to properly load the Website); however, in addition to resourced needed to load the Website and display its content to the visitor, the Website also loads third party tracking technologies, which allow third-parties with whom the visitor has no relationship, and of whom the visitor has no knowledge, to collect data about the visitor, intercept communications sent to Defendant by the visitor, and track and surveil the visitor after it leaves the Website, sometime for years, and sometimes forever.

22.   This is all done for Defendant's commercial benefit, and occurs regardless of whether or not the user has opted out by initiating a GPC Flag (the JavaScript variable navigator.globalPrivacyControl, which can be read by the web page when the browser first visits) or via the custom "Do not share my personal information" selector located at https://www.nike.com/guest/settings/do-not-share-my-data.

23.   In other words, the moment a visitor lands on the Website, Defendant instructs the visitor's web browser to download technologies from third parties, that collect visitor data beyond what is necessary to utilize the Website, shares visitor data with third parties, and is used to track the visitor after they leave the Website – and moreover, Defendant does this *even if* the GPC Flag

has instructed it not to do so, and *even if* the visitor has deselected all sharing permissions on the Website itself.

24.     More specifically, upon visiting the Website, the following third party surveillance and tracking technologies execute and collect data by sending network requests to third party endpoints. This takes place **every time** (and thus, when Plaintiffs visited the Website), *irrespective* of whether a GPC Flag is enabled, and continues *irrespective* of whether the visitor opts out of information sharing on the Website itself:

25.     The Trade Desk: The Trade Desk (TDD) (https://www.thetradedesk.com) is a technology company that provides a self-service, cloud-based platform for advertising buyers to manage and optimize digital ad campaigns. Its platform, a Demand-Side Platform (DSP), allows marketers to use data-driven insights to plan, forecast, and purchase ads across various formats and devices, such as display, video, and connected TV. The company specializes in automated, data-driven programmatic advertising, which uses technology to buy and sell digital ad space in real-time auctions. When the Website is visited, it forces the user browser to make the following network requests to resource servers managed by The Trade Desk:

| | |
|---|---|
| Network Request URL[4] | https://js.adsrvr.org/up_loader.1.1.0.js |
| Purpose[5] | Base Code |
| Example Data Payload Passed to TDD[6] | N/A |

[4] Network Request URL refers to the URL of the request sent from the user's browser to a remote server. The URL may retrieve a remote resource to load the page and may contain user information intentionally collected by trackers.

[5] The purpose of the download, which can include **iFrame** (an embedded HTML document that can load further resources and pass along browser and user data); **Base Code** (remote code that enables functions including gathering web browser data or user information and can initiate a network request to transmit that data); or **Data Collection** (a request designed to transmit browser or user information for tracking or behavioral recording).

[6] An example payload passed with the request if the request uses the POST method to send data instead of GET.

| Hard Coded in HTML or Dynamically Loaded [7] | Dynamically Loaded |
|---|---|
| Originator of Network Request [8] | https://www.googletagmanager.com/gtm.js?id=GTM-NTF2X45&l =marketingClientDataLayer (Google Tag Manager) |

| Network Request URL | https://insight.adsrvr.org/track/cei?advertiser_id=fcx45do&cookie_sync=1&upv=3.0.0&upid=sseyzi1&ref=https://www.nike.com/ |
|---|---|
| Purpose | iFrame |
| Example Data Payload Passed to TDD | N/A |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
| Originator of Network Request | https://js.adsrvr.org/up_loader.1.1.0.js |

| Network Request URL | https://js.adsrvr.org/universal_pixel.js |
|---|---|
| Purpose | Base Code |
| Example Data Payload Passed to TDD | N/A |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
| Originator of Network Request | https://insight.adsrvr.org/track/cei?advertiser_id=fcx45do&cookie_sync=1&upv=3.0.0&upid=sseyzi1&ref=https://www.nike.com/ |

| Network Request URL | https://insight.adsrvr.org/track/realtimeconversion |
|---|---|

---

[7] Indicates how the browser was instructed to make the network request. Options include:

- Hard Coded: The resource was hard-coded into the raw HTML of the web page.

- Dynamically loaded: The resource was loaded by another resource that was either hard coded or dynamically loaded on the page. One way this can occur is through a Tag Management System (TMS). A TMS is a centralized tool that allows a website or app owner to manage tags (small pieces of JavaScript code) from a single interface without needing to change the site's underlying code. By implementing a single "container" tag, the team responsible for tag management can add, update, and deploy various marketing and analytics tags (such as Google Analytics or advertising platforms) through the TMS. This provides a single source for defining behaviors (like page views or clicks) and sending data to multiple platforms, giving better control over data collection and a faster way to make updates.

[8] The specific line number or dynamic resource that invoked the network request.

| Purpose | Data Collection |
|---|---|
| Example Data Payload Passed to TDD | {"data":[{"adv":"fcx45do","pixel_ids":["sseyzi1"],"referrer_url":"https://www.nike.com/", "dpop":"LDU","data_processing_option":null,"privacy_settings":[]}]} |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
| Originator of Network Request | https://js.adsrvr.org/universal_pixel.js |

26.     In other words, the Website installs code from Trade Desk on every visitor's computer, which then runs quietly in the background to track and surveil each visitor's online activities *after they leave the Website*, collecting data from each visitor's computer for an extended period after the visitor has left the Website, for Defendant's commercial profit.

27.     Google AdSense: Google AdSense is a product from Google used for ad delivery, analytics, and content. When the Website is visited, it forces the user browser to make the following network requests to resource servers managed by Google AdSense:

| Network Request URL | https://pagead2.googlesyndication.com/ccm/collect?frm=0&en=page_view&dl=https%3A%2F%2Fwww.nike.com%2F&scrsrc=www.googletagmanager.com&rnd=829262182.1763069829&navt=r&npa=1&gtm=45He5bc0v831367757za200zd831367757xea&gcs=G100&gcd=13q3q3q3q5l1&dma_cps=-&dma=0&tag_exp=101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~115583767~115616986~115938466~115938468~116217636~116217638&tft=1763069828563&tfd=4760&apve=1&apvf=f |
|---|---|
| Purpose | Data Collection |
| Example Data Payload Passed to TDD | N/A |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |

9

| Originator of Network Request | https://www.googletagmanager.com/gtm.js?id=GTM-NTF2X45&l =marketingClientDataLayer (Google Tag Manager) |
| --- | --- |

| Network Request URL | https://ade.googlesyndication.com/ddm/activity/src=4171764;type =category;cat=pdppages;ord=6991197175744;npa=1;u1=us;u2= en_us;u3=homepage;u4=%2F;u5=0;u6=;u8=en_us;u10=;u11=;u 12=0;u13=0;u14=usd;u15=;u17=https%3A%2F%2Fwww.nike.co m%2F;u23=;u24=;u25=us;u26=usd;u27=0;u28=Desktop;u29=0;u 33=;u34=;u35=false;u36=en_us;u37=usd;u38=N;u40=;u41=0;u4 2=;u43=0;u44=;u45=;u48=0;u49=0;u50=N;u51=0;u52=null;u53=; u54=;u55=;u56=0;u58=0;u59=0;u60=https%3A%2F%2Fwww.nik e.com%2F;u61=N;uaa=x86;uab=64;uafvl=Chromium%3B142.0.7 444.162%7CGoogle%2520Chrome%3B142.0.7444.162%7CNot _A%2520Brand%3B99.0.0.0;uamb=0;uam=;uap=Windows;uapv =19.0.0;uaw=0;pscdl=denied;frm=0;_tu=KFA;gtm=45fe5bc0v919 0996969z8831367757za200zb831367757zd831367757xea;gcs= G100;gcd=13q3q3q3q5ll;dma_cps=-;dma=0;dc_fmt=8;tag_exp= 101509157~103233427~104527907~104528500~104684208~1 04684211~105446120~115583767~115938466~115938468~116 217636~116217638;epver=2;~oref=https%3A%2F%2Fwww.nike. com%2F? |
| --- | --- |
| Purpose | Data Collection |
| Example Data Payload Passed to TDD | N/A |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
| Originator of Network Request | https://www.googletagmanager.com/gtag/destination?id=DC-417 1764&l=marketingClientDataLayer&cx=c&gtm=4e5bc0 (Google Tag Manager) |

28.     In other words, the Website installs code from Google AdSense on every visitor's computer, which then runs quietly in the background to track and surveil each visitor's online activities *after they leave the Website*, collecting data from each visitor's computer for an extended period after the visitor has left the Website, for Defendant's commercial profit.

29.     PubMatic: PubMatic is a digital advertising technology company that provides a supply-side platform (SSP) to help publishers monetize their content. PubMatic's platform facilitates real-time programmatic ad transactions, connecting publishers with advertisers and

enabling them to maximize ad revenue across various formats like websites, apps, and connected TV (CTV). When the Website is visited, it forces the user browser to make the following network requests to resource servers managed by PubMatic:

| | |
|---|---|
| Network Request URL | https://simage2.pubmatic.com/AdServer/Pug?vcode=bz0yJnR5c GU9MSZjb2RlPTI4NDkmdGw9MTI5NjAw&gdpr=0&gdpr_consen t=&piggybackCookie=63a311be-19cd-48cb-b532-9435c6d228c3 &r=https%3A%2F%2Fmatch.adsrvr.org%2Ftrack%2Fcmf%2Fge neric%3Fttd_pid%3Dpubmatic |
| Purpose | Data Collection |
| Example Data Payload Passed to TDD | N/A |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
| Originator of Network Request | https://insight.adsrvr.org/track/cei?advertiser_id=fcx45do&cookie sync=1&upv=3.0.0&upid=sseyzi1&ref=https://www.nike.com/ |

30.     In other words, the Website installs code from PubMatic on every visitor's computer, which then runs quietly in the background to track and surveil each visitor's online activities *after they leave the Website*, collecting data from each visitor's computer for an extended period after the visitor has left the Website, for Defendant's commercial profit.

31.     Index Exchange (formally Casale Media): Index Exchange is a programmatic advertising company that connects media owners and marketers to buy and sell digital ad space. When the Website is visited, it forces the user browser to make the following network requests to resource servers managed by Index Exchange:

| | |
|---|---|
| Network Request URL | https://dsum-sec.casalemedia.com/rum?cm_dsp_id=39&external _user_id=63a311be-19cd-48cb-b532-9435c6d228c3&expiration= 1765662749&gdpr=0&gdpr_consent= |
| Purpose | Data Collection |
| Example Data Payload Passed to TDD | N/A |

| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
|---|---|
| Originator of Network Request | https://insight.adsrvr.org/track/cei?advertiser_id=fcx45do&cookie_sync=1&upv=3.0.0&upid=sseyzi1&ref=https://www.nike.com/ |

32.     In other words, the Website installs code from Index Exchange on every visitor's computer, which then runs quietly in the background to track and surveil each visitor's online activities *after they leave the Website*, collecting data from each visitor's computer for an extended period after the visitor has left the Website, for Defendant's commercial profit.

33.     Bidswitch: BidSwitch is a technology company that provides a centralized middleware platform to connect supply-side platforms (SSPs) and demand-side platforms (DSPs) in the digital advertising ecosystem. When the Website is visited, it forces the user browser to make the following network requests to resource servers managed by BidSwitch:

| Network Request URL | https://x.bidswitch.net/syncd?dsp_id=93&user_group=1&user_id=63a311be-19cd-48cb-b532-9435c6d228c3&expires=30&redir=https%3A%2F%2Fmatch.adsrvr.org%2Ftrack%2Fcmf%2Fgeneric%3Fttd_pid%3Dbidswitch |
|---|---|
| Purpose | Data Collection |
| Example Data Payload Passed to TDD | N/A |
| Hard Coded in HTML or Dynamically Loaded | Dynamically Loaded |
| Originator of Network Request | https://insight.adsrvr.org/track/cei?advertiser_id=fcx45do&cookie_sync=1&upv=3.0.0&upid=sseyzi1&ref=https://www.nike.com/ |

34.     In other words, the Website installs code from Bidswitch on every visitor's computer, which then runs quietly in the background to track and surveil each visitor's online activities *after they leave the Website*, collecting data from each visitor's computer for an extended period after the visitor has left the Website, for Defendant's commercial profit.

35.     Each visitor is secretly tracked and surveilled for Defendant's marketing purposes and profit. A person may visit the Website and then move on to a different website or to social media. But now, ads for Nike might be everywhere. They're on news websites, in the social media feed, and everywhere else the targeted visitor goes online. Third parties now use each visitor's computer as a private marketing asset, for Defendant's profit.

36.     This happens because the Website invades the visitor's web browser, making the visitor's private browser, and private browsing, an open book to all the marketing companies named above. In this way, the software that Defendant installs on visitor web browsers acts as a spyware, decoding the user's identity, implanting surveillance processes on the visitor's web browser, and following the visitor around the internet to serve ads or gather information – or sometimes, to simply observe and surveil browsing habits, often for years.

37.     Because the Website prompts the download of the invasive code described above onto each Website visitor's private web browser, on information and belief, they were each downloaded onto the web browsers of every member of the Class (as defined below), including the Plaintiffs' web browsers.

38.     Of course, undertaking this conduct legally is easy enough. Defendant need only disclose its intent to cause installation of invasive software on a visitor's web browser *before doing so* and must respect visitor's privacy choices (such as GPC Flags and "your privacy choices" selections). Defendant does not do so. This is likely because, when true consent is sought and respected, some considerable number of Website visitors will withhold that consent, thus depriving Defendant of intelligence into the movements and activities of Website visitors after they move on to other websites, thus cutting into Defendant's profits. Put otherwise, the information gleaned

13

from usurping private web browsers and invading online privacy may simply be too valuable to worry about or respect consent.

39.     Plaintiffs, and all similarly situated persons, had a reasonable expectation *that their own web browsers on their own computers* were not invaded and used to track and surveil them for Defendant's marketing purposes and profit, and yet, that is exactly what Defendant has done, entitling Plaintiffs, and all similarly situated persons, to all appropriate relief.

## CLASS ALLEGATIONS

40.     Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and/or (c)(4), Plaintiffs assert claims on behalf of all similarly situated persons, as follows:

> All persons who accessed the Website from within Florida during the two-year period preceding the filing of this action (the "Class").

41.     Excluded from the Class are any of Defendants' officers, directors, and board members; all persons who make a timely election to be excluded from the Class; and the judges to whom this case is assigned and their immediate family.

42.     Plaintiffs hereby reserve the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

43.     The proposed Class meets the criteria for certification under Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3) and (c)(4).

44.     Numerosity. Fed. R. Civ. P. 23(a)(1). Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs very conservatively estimates that the proposed Class is comprised of hundreds of

14

thousands of members.[9] Class members may be identified through objective means; Defendant's analytic cookies log the IP address of every visitor, and Florida IP addresses that visited the Website over the past two years can be gathered from that log. Class members may thus be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notices.

45. Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). Plaintiffs and the Class were all subject to the same violation of their personal computer systems and private web browsers, and each is entitled to damages in the same amount, as set forth in more detail below.

46. Typicality. Fed. R. Civ. P. 23(a)(3). Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of those of the other Class members. Plaintiffs' damages and injuries are identical to the other Class members, and Plaintiffs seek relief consistent with the relief to which every other member of the Class is entitled.

47. Adequacy. Fed. R. Civ. P. 23(a)(4). Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are member of the Class and are committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiffs have no conflict of interest with the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including consumer class actions. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

48. Superiority. Fed. R. Civ. P. 23(b)(3). Consistent with Fed. R. Civ. P. 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this

---

[9] According to multiple online sources that keep such statistics, the Website has approximately 100 million visitors per month. Florida has approximately 7% of the U.S. population. Accordingly, at this time, Plaintiffs conservatively posits that the Class is comprised of hundreds of thousands of members, but discovery may reveal the number to be significantly larger than that.

class action. Here, the damages suffered by Plaintiffs and the other members of the Class are relatively small amounts, but require evidence of a technical nature to pursue, and are far more efficiently pursued by a collective action than piecemeal over hundreds of thousands (or more) individual cases.

49.     Plaintiffs will adequately and fairly represent the interests of the Class and has retained counsel experienced in class action litigation. Plaintiffs have no interests that are contrary to or in conflict with the interests of the members of the Class that he seeks to represent.

50.      Common questions of fact and law exist as to all members of the Class and predominate over questions solely affecting any individual member of the Class; examples of the questions of law and fact applicable to all members of the Class are:

a.   Whether Defendant has violated Florida law by failing to ask prior consent before using its Website to trigger the download of third-party software onto private visitor wen browsers;

b.   Whether Defendant has violated Florida law by failing to ask prior consent before triggering download of third-party software onto private visitor web browsers;

51.     Finally, all members of the proposed Class are readily ascertainable by records maintained by Defendant. Defendant has captured PII, including IP addresses, of all members of the Class who visited the Website during the applicable statute of limitations periods. This data can be used to ascertain every single member of the Class.

## COUNT I
## CONVERSION

Plaintiffs and the Class re-allege and incorporate Paragraphs 1 through 51 above, as though fully set forth herein.

16

52.     Plaintiffs and the Class have ownership and uncontested possessory rights to their own personal computers and other digital devices including the web browsers thereon, and including the computing power within and upon those devices, including all data regarding personal online browsing behavior contained thereon.

53.     By visiting the Website, Plaintiffs and the Class did not consent to the download of computer code onto their web browsers, or to being tracked and surveilled indefinitely online.

54.     Defendant exercised wrongful dominion and control over the digital devices of Plaintiffs and the Class when it unilaterally prompted those digital devices to download software onto each device's web browser, which Defendant had no privilege to do, and which was done in a manner inconsistent with Plaintiffs and the Class' ownership and possessory rights.

55.     By this act, Defendant (a) converted digital devices belonging to Plaintiffs and the Class, in some part, to its own marketing use and business purposes; and (b) converted personal data belonging exclusively to Plaintiffs and the Class to its own commercial for-profit purposes.

56.      Defendant undertook these actions unilaterally, intentionally, willfully exercising wrongful dominion and control over computing systems that belong to Plaintiffs and the Class, in a manner inconsistent with the absolute and total ownership interest, and possessory rights, of Plaintiffs and the Class to their own digital devices.

57.     Defendant's actions resulted in deprivation of property rights of Plaintiffs and the Class, who would otherwise have had total and complete ownership and right to use and control their own digital devices and web browsing histories, as well as usurpation (and dissemination) of personal data, including personally identifying information and online activity. This deprivation occurred without consent, and to the contrary, in many instances occurred despite express withholding of consent.

17

58.     In addition to the monetary value of unauthorized use of digital devices belonging exclusively to Plaintiff and the Class for their own marketing purposes, Plaintiffs and the Class are entitled to all profits derived by conversion of their electronic data, including all profits fairly traceable to electronic targeting and re-targeting, as well as disgorgement of all profits generated by Defendant as a result of its conversion of digital devices, web browsers, and data, and punitive damages for intentional misconduct as may be deemed appropriate by a jury in this case.

WHEREFORE, Plaintiffs respectfully requests that this Court (a) certify the Class as defined above, comprised of all similarly situated person; (b) award Plaintiffs and every member of the Class compensation for Defendant's conversion of their computing systems and data; (c) award such punitive damages as are deemed just and equitable for Defendant's intentional misconduct; (d) disgorge all profits made by Defendant by virtue of its unlawful conduct; and (e) award all such further relief as is deemed just and equitable under the circumstances presented.

## COUNT II
## UNJUST ENRICHMENT

Plaintiffs and the Class re-allege and incorporate Paragraphs 1 through 51 above, as though fully set forth herein.

59.     Defendant received a benefit from Plaintiffs and the Class in the form of using their digital devices, web browsers, and electronic data, for Defendant's own commercial for-profit marketing purposes.

60.     Defendant had knowledge of the benefit that it derived. On information and belief, Defendant has detailed analyses regarding revenues generated by virtue of the third party software that it causes to be downloaded on visitor web browsers, and Defendant is aware that this benefit is derived by usurping the web browsers and digital devices that belong to Plaintiffs and the Class.

61.     Defendant has accepted and retained the benefits derived in this regard; specifically, the benefit of tracking devices installed on the private web browsers of every Website visitor, including but not limited the benefit of serving targeted ads across to internet.

62.     It would be wholly inequitable for Defendant to retain the financial benefits of its usurpation of visitor devices and web browsers, particularly since Defendant's actions were unauthorized, undertaken even after consent was explicitly withheld in many cases, and violate principles of fairness, fair play, and equity.

63.     Plaintiffs and the Class are entitled to restitution in the form of all profits derived by converting the electronic data of Website visitors, including all profits fairly traceable to electronic targeting and re-targeting, as well as disgorgement of all profits generated by Defendant as a result of its taking and use of computing systems and data from Website visitors, as well as punitive damages for intentional misconduct as may be deemed appropriate by a jury in this case.

WHEREFORE, Plaintiffs respectfully requests that this Court (a) certify the Class as defined above, comprised of all similarly situated person; (b) award Plaintiffs and every member of the Class compensation for Defendant's conversion of their computing systems and data; (c) award such punitive damages as are deemed just and equitable for Defendant's intentional misconduct; (d) disgorge all profits made by Defendant by virtue of its unlawful conduct; and (e) award all such further relief as is deemed just and equitable under the circumstances presented.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a jury trial as to all claims so triable.

19

Dated this **13th** day of **February, 2026.**

<div style="margin-left:50%;">

Respectfully submitted,

**SALPETER GITKIN, LLP**
3864 Sheridan Street
Hollywood, FL 33021
Telephone: (954) 467-8622
Facsimile: (954) 467-8623

By: */s/ James P. Gitkin*
JAMES P. GITKIN, ESQ.
Fla. Bar No.: 570001
*jim@salpetergitkin.com*
*shelley@salpetergitkin.com*

**ENTIN LAW GROUP, P.A.**
*Co-counsel for Plaintiffs*
1213 S.E. Third Avenue
Fort Lauderdale, FL 33316
Telephone: (954) 761-7201

By: */s/ Joshua M. Entin*
JOSHUA M. ENTIN, ESQ.
Fla. Bar No.: 493724
*josh@entinlaw.com*
*laurac@entinlaw.com*

**LAW OFFICES OF NOLAN KLEIN, P.A.**
5550 Glades Rd., Ste. 500
Boca Raton, FL 33431
Telephone: (954) 745-0588

By: */s/ Nolan K. Klein*
NOLAN K. KLEIN, ESQ.
Fla. Bar No.: 647977
*klein@nklegal.com*
*amy@nklegal.com*

</div>

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing has been served by CM/ECF on February 13, 2026, on all counsel or parties of record. Notice of this filing will be sent to counsel of record by operation of the court's electronic filing system.

By: */s/ James P. Gitkin*
James P. Gitkin, Esq.

**SERVICE LIST**

Spencer M. Diamond, Esq.
King & Spalding LLP
1180 Peachtree St. NE, Ste. 1600
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
*sdiamond@kslaw.com*

Michael D. Roth, Esq. (*pro hac vice*)
Lennette W. Lee, Esq. (*pro hac vice*)
Samuel C. Cortina, Esq. (*pro hac vice*)
King & Spalding LLP
633 W. 5th St., Ste. 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
*mroth@kslaw.com*
*llee@kslaw.com*
*scortina@kslaw.com*

21